## McCREARY, Adm'r v. THE STATE.

REAL ESTATE BANK—*Act of January* 16, 1861, *constitutional*.—The Act of the Legislature of January 16, 1861, entitled "An Act to aid the foreclosure of the stock mortgages, given to secure the stock subscriptions to the Real Estate Bank of the State of Arkansas," was intended to furnish a remedy different from that which existed when the obligations were entered into, and although it changed the remedy effecting the enforcement of existing obligations, by abridging the pleadings, simplifying the issues and regulating the mode and manner of the proceedings, yet it did not impair the obligation of contracts, or infringe upon the existing rights of the parties, and is in none of its provisions or requirements unconstitutional.

SAME—*Holford Bonds*—The bonds known as the "Holford Bonds," were not intended to be embraced within the provisions of the Act of 1861, and a suit under that Act, so far as they are concerned, to recover the amounts received upon the five hundred hypothecated bonds, cannot be maintained.

APPEAL FROM PULASKI CHANCERY COURT.

Hon. T. D. W. YONLEY, *Chancellor.*

*Gallagher & Newton, Garland & Nash*, for Appellants.

*First.* There is no equity in the bill.

*Second.* The State of Arkansas shows no right in herself to proceed in behalf of the creditors and the bondholders of the Real Estate Bank. Or, in other words, as appears here, she fails to show any legal interest in the suit as a party complainant, and failing in that, she has no case. *Cummins vs. James*, 4 *Ark.*, 616; *Roane vs. Lafferty*, 5 *Ark.*, 465; *Robinson vs. Denton*, 6 *Ark.*, 283; *Bingham vs. Calvert*, 13 *Ark.*, 401; *Story's Eq. Pls.*, 76, 137, 153-4. Under no pretext can this stand as a creditor's bill, and on no other ground can a bill, seeking to do what this does, be brought. *Story's Eq. Pls.*, 79-126.

*Third.* The *State* does not show that she has paid the debt, or any part thereof, covered by the mortgage now sought to be foreclosed; nor does she show that she has secured the payment thereof. Under the charter of the Real Estate Bank the *State* became, by issuing her bonds to secure the

capital of the bank, a mere security. (*See Act of 26th October*, 1836, *Sec*. 10, *et seq*.) And, necessarily, before she can obtain a foreclosure here, she must show she either paid the debt of the *bank* or a part of it, or that she has provided some means by which to pay. *Wright vs. Morley*, 11 *Ves*., 22, *note* 4; *Clifford ex parte*, 6 *Ves*., 805; 6 *Penn*. (*Barr*), 504–5; 2 *Binney*, 382; 9 *Watts*, 451; *Dixon on Subrogation*, 122–135, *note*; 2 *Bouvier Law Dict*. (*Subrogation*), 536–7; *Comegs vs. State Bank*, 6 *Ind*., 357; *Richmond vs. Maston*, 15 *Ib*., 134; 2 *Jones Eq*. (*N. C.*), 414; 4 *Ib*., 262; 33 *Ala*., 261; 5 *Sneed* (*Tenn*.), 86; 4 *Ib*., 482; *Lee et el. vs. Griffin et al.*, 31 *Miss*. (2 *George*), 632; *Bibb vs. Martin et al.*, 14 *S. and Mar*., 87; 2 *Tucker's Com*., 492; *Duncan vs. Biscoe*, 2 *Eng*. (7 *Ark*.), 192–3; 24 *Ark*., 567–8; *Nichols vs. Dunn*, 25 *Ark*.; 2 *Am. Lead. Cases*, 98–100, 130–4; *Pittman on Principal and Surety*, 125–141. And the doctrine is well and lucidly expressed in 2 *Wash. Real Prop.*, 166, 198, 201. To the same effect, in all its length and breadth, do we find the following: *Burge Suretyship*, 322, 356; 1 *Pothier Obl.*, 240, 301, 306, 327, 342; *Ib*. (*Art*. 2), 348, 413; 2 *Ib*., (*No*. 11), 60–70; *Lindley Juris.* (*appendix*), 246; 1 *Domat, b.* 3, *Tit*. 1, *Sec*. 6, *Arts*. 2, 3, 4, 6, 7, 8, *p*. 697 *et seq*.

*Fourth*. The State has failed to bring before the court the bondholders and creditors, or to show who and where they are; and as part of this we may discuss the fifth cause of demurrer, which is, the State fails to produce the claims or debts in court. The decree here should merge the present claims or debts, and for the future protection of the debtors against suits, the claims and claimants all must be before the court. These bonds must be brought up and re-delivered before any adjustment can be had, and so long as even one claim is out no complete account can be had, no decree rendered. *Whitney vs. Peay*, 24 *Ark*., 27. Under a law enacted for the benefit of the State, and upheld by the courts (*Platenius vs. State*, 17 *Ark*., 518; *S. C.*, 20 *How.*, 527–532), this principle was enforced, and it is not to be supposed that the court will permit the State to avoid the precedent—a prece-

dent, too, so well recognized everywhere.     *Beebe vs. R. E. Bank,* 4 *Ark.,* 516 ; *Wymack's case,* 5 *Co.,* 74, *b.; Stephen's, Pls.,* 704 ; 2 *Sand. Pl. and Ev.,* 740 ; *Browning vs. Wright,* 2 *Bos. and P.,* 13 ; *Story's Eq. Pls.,*, sec. 137 ; *Porter vs. Clements,* 3 *Ark.,* 364.    And if there is one party or claimant not thus before the court, the suit cannot be maintained. · *City of Georgetown vs. Alexandria Canal Co.,* 12 *Peters,* 91–100 ; *Story Eq. Pls., secs.* 99, 126, 153, 156 ; 1 *Turner & Russ,* 297 ; 3 *Y. & Coll.,* 597 ; *Palmer vs. Dutcher,* 7 *Paige,* 437 ; *State of Ohio vs. Ellison,* 10 *Ohio,* 456 ; *Murphy vs. Jackson,* 5 *Jones' Eq. (N. C.),* 11 ; *Calvert on Parties, sec.* 10, *p.* 225 ; 5 *Paige,* 539 ; 6 *Id.,* 583–98 ; 1 *Daniel Ch. P.,* 240–75, 462.

· *Sixth and Seventh.* The State fails to show how she has disposed of the fund seized by her, on her complaint against the trustees; and she does not offer to, turn this fund over to the creditors towards the payment of these debts. 1 *Story Eq. J.,* 64e, 301 ; *Hill on Trustees,* 522* ; *Adams Eq.,* 220* ; 33 *Penn.,* 351 ; 32 *Id.,* 495 ; *McKinney vs. New Eng. Manufacturing Co.,* 1 *Stock. (N. J.),* 371 ; *Russell vs. Clark's Ex.,* 7 *Cranch.,* 69 ; *Findley vs. Bank,* 10 *Ohio (Wilcox),* 59 ; *Index to* 1, 2, 3 *and* 4, *Ohio (Wilcox), p.* 889 ; *Brightly's Digest Federal Courts, p.* 280, *et seq.;* and see, especially, *King vs. Robinson,* 2 *Rich. (S. C.), Eq. Rep.,* 157, 192.

This is not all, the law demands absolutely the fund first taken should be exhausted, or used for its proper purpose before any further recovery can be had.    *Adams sup.; Goss vs. Lester,* 1 *Wisconsin,* 43 ; *Hays vs. Ward,* 4 *Johns. Ch.,* 123 ; 2 *Spence Eq. Juris.,* 845 ; *Caulfield vs. Macguire,* 2 *Jo. & Lat.,* 141 *(Irish Chancery,* 1844–46).

*Eighth.* The law authorizing this proceeding on the part of the State is in violation of the Constitution of the United States, and of the Constitution of the State of Arkansas.

This law (see *Acts of Legislature of* 1860-1, *page* 235), in attempting to dispense with rights and privileges secured under the original contract, and which formed a part of the contract when made, and in dispensing with certain requisites of

the law under which the contract was entered into, and with reference to which, the State and all contracted, is in violation of that section of the Constitution of the United States which prohibits a State from passing any law impairing the obligation of contracts. The first section of the law permits the State to sue without paying the bonds. Such was not the contract when made—she undertook merely (Section 10, Charter,) to be security—as we have seen. So too, in relieving the State from producing the bonds in suit. These are all new features, new conditions, and most clearly a new contract, and therefore void: *Sedgwick Construction*, 616, *et seq.*; 2 *Story Con.*, 1374-1399; *Woodruff vs. State*, 3 *Ark.*; 285; *Curran vs. State*, 15 *How.*, 804; 19 *Ark.*, 360-409; *Hope Mut. Ins. Co. vs. Flynn*, 38 *Mo.*, 483.

*Ninth.* The demand sought to be enforced is stale, and the State, by her bill, shows she has been guilty of gross laches: 2 *Storys' Eq. J.*, 7th *Ed.*, 1520; 8 *Peters*, 420; 8 *Cranch.*, 471: 17 *How.*, 340; *Pandill vs. Mullikin*, 1 *Black.*, 585; *Wagner vs. Baird*, 7 *How.*, 234; *Badger vs. Badger*, 2 *Wallace*, 94, *et seq.*

*Tenth.* A receiver being appointed, he had charge of all the assets to be fully and completely administered, and being now receiver, under the complaint of the State to execute the trust in place of the trustees, and pay the debts, he and no one else should sue to foreclose these mortgages for the benefit of all interested: *Edwards on Receivers*, 95-354. As long as he is in power, and assented to, the State must leave him to ask, sue for and recover here for the benefit of all: *Swords vs. Blake*, 3 *Edw. N. Y. Ch. R.* 112; *Kennedy vs. Gibson*, 8 *Wall.* 506; *Libby vs. Rosekrans*, 55 *Barb.*

*Eleventh.* The supposed State of Arkansas, in whose name the suit was brought, was not a State, and she was not bound for the debts of the bank.

When this suit was filed, as everybody now knows there was no State of Arkansas, and there was no right in what was then called Arkansas to sue. The right to sue must exist when suit is brought, and if not then existing the suit

cannot be maintained, and the question can be presented by demurrer: 17 *Ark.*, 442; 21 *Ib.*, 189; *Hornor vs. Hanks*, 22 *Ark.*, 572; *Adams Eq.*, 413.

*Benjamin, Solicitor General*, for the State.

*First.* The first point raised in the demurrer is, that there is no equity in the bill. As this one is included in, and depends upon, others, it will be passed for the present.

*Second.* The second point raised in the demurrer is that the State of Arkansas shows no right in herself to sue in behalf of herself and for the use of the creditors and bondholders of the Real Estate Bank. She is authorized to do so by express statute: *See Acts of* 1860-1, *page* 236; which is always the highest law known to the State, and which is, of itself, sufficient authority for bringing the suits, if there was no other law upon the subject; but, if there was no express statute authorizing the suits, the State would still be authorized to sue, etc.

The Constitution of the State of Arkansas authorized the General Assembly to estabish a bank for the promotion of the agricultural interests of the State, and loan the faith and credit of the State for the same; *"Provided,* such security can be given by the individual·stockholder as will guarantee the State against loss or injury."

It is a well-established doctrine that sureties and guarantors have the right to enforce mortgages or other counter securities given"to indemnify or guarantee them against payment, loss, or injury, as soon as they are endangered: *Tankersly vs. Anderson, et als.*, 4 *Dessaussure's Equity Reports*; *Bishop vs. Day et als.*, 13 *Vermont, page* 88; *Bellune vs. Walace*, 2 *Richardson's Reports*, *p.* 80; *Toulmin et als. vs. Hamilton et als.*, 7 *Ala.*, 362, and *Ohio Life Insurance Company vs. Ledgard et als.*, 8 *Ala.*, *p.* 872; *Hunter & Davis vs. Levan and wife*, 11 *Cal. p.* 1.

See, also, the following authorities, which fully sustain the same doctrine: *Fells' Law of Guaranty and Surety, pages* 278,

279, and cases there cited.   See, also, *Wagman et als vs. Hoag,* 14 *Barbour,* 232; *Bobbett, executor, et als. vs. Flowers, et als.,* 1 *Swann, (Tenn.) page* 511; *Barker et als. vs. Buel et als.,* 5 *Cushing (Mass.),* 520; *Teeter vs. Pierce,* 11 *B. Monroe,* 379.

But the right to sue on these mortgages has been fully settled by our own Supreme Court: *Wilson vs. Biscoe et al.,* 11 *Ark.* 44.

The third reason assigned for cause of demurrer is, that the State of Arkansas does not show that she has paid the debt or any part thereof.

The State of Arkansas is not a simple surety for these bonds without any special guarantee or security whatever.   The State in these bonds became the principal, as between the State and bond-holder, and, in consideration for doing so, was secured by mortgages and special guarantee from the individual stock-holders of the Real Estate Bank.

Can there be any question but that the guarantee to pay and the guarantee against loss or injury are broken, and that a cause of action has accrued on each thereof? *See Faust, assignee, etc., vs. Burgevin et als.,* 25 *Ark.,* 170; *Thomas vs. Allen,* 1 *Hill,* 145; *Churchill and Hays vs. Hunt,* 3 *Denio,* 321; *Ramsay vs. Gervais,* 2 *Bay, S. C.,* 145 ; *East River Bank vs. Rogers,* 7 *Bosworth,* 493 ; *Gilbert vs. Wiman, et als.,* 1 *Comstock,* 550 ; *Chace vs. Hinman,* 8 *Wendell,* 452; *Town of Lyman vs. Lull,* 4 *N. H.,* 495 ; in matter of *Negus,* 7 *Wendell,* 499.

As to the fourth and fifth causes assigned, it is sufficient answer to say that the act of 1860-61 expressly provides that the State may sue without bringing the bondholders or claims before the court.

As to the sixth and seventh causes assigned, it is sufficient to say that the receiver's reports show what was seized and what disposition was made of it.   Furthermore, the law of 1860-61 provides that these cases be referred to a master to ascertain how much is now due thereon.

As to the eighth cause assigned, that the law of 1860-61 is in violation of the Constitutions of this State and of the

United States, *See The State vs. Fairchild*, 15 *Ark.*, 619; *Bronson vs. Kinzie et al.*, 1 *Howard*, 315; *Gordon vs. The South Fork Canal Company et al.*, 1 *McAllister*, 513; *U. S. Bank vs. Longworth*, 1 *McL.*, 35; *U. S. vs. Jas. S. Conway*, *Hemp.*, 313.

As to the objection that the law did not take effect until after the passage of the ordinance of secession, *See Farrelly vs. Milor*, 25 *Ark.*, 353.

As to the ninth cause assigned, that the demand is stale, it is answered, by matter of fact, that the State has shown due diligence, and further laches do not apply to a government. *See Marion County vs. Moffett*, 15 *Mo.*, 604; *Park vs. The State*, 7 *Mo. Rep.*, 194.

As to the tenth cause assigned, it is sufficient to say that the mortgages were not due at that time and could not be foreclosed—(*See Edwards on Receiver, p. 5*).

As to the cause that the supposed State of Arkansas, in whose name the suit was brought, was not a State, and not bound for the debts of this State, *See State of Texas vs. G. W. White*, 3 *Am. L. R.*, 770.

GREGG, J.—Under the act of the Legislature of January 16th, 1861, the State of Arkansas filed her bill of complaint against the east half southwest quarter, and west half southeast quarter of section twenty, in township thirteen south of range twenty-nine west, in which she alleges that under the act of the State Legislature of October 26, 1836, the State issued two millions of dollars in her bonds, bearing interest at five per cent., and payable at twenty-five years, to the order of the Real Estate Bank, and transferrable by indorsement; and that it was further provided in said act that said bank was to pay the interest, and when due, the principal of said bonds; that stock should be first subscribed to the amount of $2,250,000, and such subscription secured by mortgages on real estate, conditioned for the payment of all moneys received from the bank and the final payment of the bonds of the State, which mortgages were the base of the capital of

the bank; that afterwards the interest upon the bonds, by act of the Legislature, was increased to six per cent., and that on the first day of January, 1838, the Governor issued fifteen hundred and thirty of such bonds, each for one thousand dollars, which were indorsed and, in September of that year, sold five hundred of them to the Secretary of the United States Treasury, and one thousand to Joseph D. Beers, and thirty to R. M. Johnson, but that the present holders are unknown; that under the act of the Legislature of 1838, to establish a western branch bank, five hundred bonds, of like conditions, amounts and terms, were issued on the first of January, 1840, upon similar subscriptions of stock and mortgages, which stock, bonds and mortgages were transferred to the State and the holders of her bonds, as an indemnity for the payment of the State bonds.

It is further alleged that these five hundred bonds were hypothecated for $121,336 59, without authority of law, and that the State is not bound to pay them.

It is alleged that Thomas B. Hayne, on the 10th day of June, 1837, having subscribed for forty shares, gave his stock bond for $4000, payable to the bank, or order, with five per cent. interest, half yearly, and due 26th of October, 1861; and that he, on said 10th day of June, executed his mortgage to said Real Estate Bank, conditioned as aforesaid, on the east half southwest quarter, and west half southeast quarter section twenty, township 13 south of range twenty-nine west; that afterwards, on the 16th day of September, 1837, thirty-eight shares of stock (valued at $100 each), were awarded said Hayne, and he became a stockholder to that extent, and that he has not paid off said stock bond, nor has he paid so much of the bonds of the State issued to said bank, etc.

It is also alleged that said Real Estate Bank, on the second day of April, 1842, by deed of assignment, conveyed to Henry L. Biscoe and others, as trustees, all the property and effects of said bank, in trust to pay off her liabilities in the order therein stated, who took charge of said effects and adminis-

tered said trust until the second day of April, 1844; that in
July, 1844, upon *quo warranto* before the Supreme Court of
this State, the charter of said bank was declared forfeited,
and it ceased to exist as a corporation; that by a decree of
the Chancery Court, rendered on the 20th day of April, 1855,
upon a bill against the residuary trustees, charging fraud and
waste in the administration of said trust, said trustees were
removed, and a receiver appointed to take charge of all the
assets of said bank, to administer the same, make reports,
etc.; that to secure the 22,500 shares of stock awarded under
the act of 1836, mortgages had been executed upon 127,-
829 65-100 acres of land, valued at $2,603,922 72-100; that
to secure the 5640 shares awarded stock-holders under the act
of 1838, to establish the Western Branch Bank, one hundred
mortgages were executed to said Real Estate Bank upon
60,290 24-100 acres of land valued at $776,840 6-100; that by
the receiver's report of October, 1866, there were outstanding
and unredeemed 888 of the 1530 bonds, on which was due of
principal $888,000, and of interest $1,066,000, that there was
also unpaid the sum of $121,336 59, obtained by the hypothe-
cation of said five hundred bonds, and interest on said sum
from the 7th of September, 1840, to the date of said report,
amounting to $189,750 27, and of notes out, in circulation,
$12,755; and that the total available assets at that date were
$512,341 31, and therefore the liabilities over the assets were
$1,771,500 59, and that the condition of said assets remain as
then, and she prayed for a foreclosure of the said mortgage
for her protection, as well as for the benefit of the holders of
the bonds of the State and the creditors of the bank, to en-
force the payment of said bonds and the interest thereon,
which she is bound to pay to preserve her faith, etc., and that
if payment of such proportional sum as may be chargeable
upon the lands, above described, be not paid, that they be
sold, etc.

Under the act of the Legislature, first referred to, the ap-
pellant appeared in the Chancery Court and claimed to be the

28

owner of the lands proceeded against, and by order of that court he was made a party and allowed to defend the action; whereupon he interposed a demurrer to the bill, in which were eleven specifications.

The first was a general denial of equity on the face of the bill.

The second was that the State had no right to sue in behalf of herself and the creditors and bond-holders.

The third, that the State does not show that she has paid or secured the debt.

*Fourth.* That the State has failed to bring the bond-holders before the court.

*Fifth.* That the State does not bring into court the claims or debts for which she seeks a foreclosure, nor does she show that she has control of them.

*Sixth.* That the State fails to show what disposition has been made of the funds she seized as assets of the bank.

*Seventh.* The State fails to offer to turn over such assets.

*Eighth.* That the law under which suit is brought is unconstitutional.

*Ninth.* That the demand is stale.

*Tenth.* That the State's rights were equitable only, and she should have proceeded to foreclose when she seized the assets and had a receiver appointed.

*Eleventh.* That there was no State of Arkansas when this suit was brought.

We propose a short review of these several causes of demurrer, mainly in their inverse order.

The last cause assigned, that Arkansas was not a State needs no comment.

The ninth and tenth assume that the State is barred by lapse of time and her neglect to sue. The record discloses the fact that the mortgage sought to be foreclosed fell due in October, 1861; until that time it would not have been proper for any party to have brought a bill to foreclose this mortgage. The legal presumption is that a mortgagor will pay his debt and

relieve his property before a forfeiture of the right of re-
demption. At all events he should not have been harrassed
by suits, and taxed with attorney's fees, etc., until in default
by the terms of his contract. Therefore, the right to sue
properly accrued in October, 1861, at which time the State
was in rebellion, and this action was brought in 1867 ; not an
unreasonable time after the close of the war, and hence it is
not necessary to pass upon the question mooted by counsel,
as to whether or not in such case time runs against the State.

The eighth assignment challenges the constitutionality of
the act of the Legislature of 1861. It is not controverted
that a law which merely changes or regulates the remedy is
not unconstitutional, although it affects the enforcement of
existing as well as future obligations. Nor can it be contro-
verted that an act of the legislature which impairs the obli-
gation of a contract, or which cuts off or so modifies the
remedy that it cannot be made effective, is unconstitutional
and void, and the validity or invalidity of the act in question
depends upon how it classifies under these definitions. From
the whole object and scope of this act, it was clearly intended
to furnish a remedy different from that which existed when
these obligations were entered into; the matters of expected
litigation appeared so complicated and extensive that the
will of the Legislature seemed to be to abridge the pleadings,
to narrow down and simplify the issues so as to reach the end
of litigation by the shortest practicable way. And all this is
within the power of legislation, if the acts do not infringe
upon existing rights.

The State assumed a large liability. To indemnify her the
bank promised to pay off her bonds, and the mortgagors
bound themselves to pay off their stock bonds with all the
interest that might accrue, or to pay such an amount of the
bonds of the State, issued in favor of the bank, equal to the
amount of stock granted to them respectively or their equity
of redemption was subject to foreclosure.

Now the act in question does not lessen the time for, or in-

crease the amount of payment to be made by the mortgagor, nor does it change the funds required or the manner of payment. It only regulates or prescribes the mode of obtaining judgment and sale and, in this, it cuts off no defense, but allows the mortgagor, and all others who claim any interest, to appear, defend and maintain such rights as they may have, and although the manner of commencing the action, serving notice and proceeding to judgment, is not the same as when the obligation was entered into, yet, while the obligor is secured in all his rights under the contract, where he is liable to pay no more than formerly and within no less time than stipulated, and no new conditions added, it is but a regulation of the remedy and does not impair the obligation of the contract.

The sixth and seventh causes allege that the State has not turned over, or shown what disposition has been made of the funds seized and placed in the hands of the receiver; while this is not done with as much particularity and fullness as might have been done, yet, by examination of certain reports refered to, among other things, containing a statement of the amount of these assets, in October 1866, with an allegation that the condition of these assets remain as then, it seems to us that they are sufficiently accounted for to enable the claimant to form an issue upon this allegation, or, if it be conceded, to estimate the amount thus paid, by the offer of the State to deduct those available assets by her so received.

The fourth cause of demurrer is that the State has not brought the bond-holders before the court; and the fifth, that she has not the bonds or claims before the court.

The Act of 1861, which we have shown was not unconstitutional, expressly provided for prosecuting such suits, as this, without making profert of the State's bonds, or paying them off. The suit is being prosecuted in the interest of the holders of the State's bonds as well as that of the State, and the bill alleges that they are unknown, too numerous, etc., to be brought before the court, but they may be satisfied, if not

under this law, they have a perfect right to come in and set up any equity they may have, and by the terms of this Act, they have been notified of the pendency of this suit, and if they are content, we see no good reason or law requiring this defendant to here complain for them, and his future interests, under the decrees that may be in this cause, are fully protected by the faith and credit of the State; and we must recognize some difference between a proceeding carried on by a sovereign State, and one by an individual man.  The sovereignty must be presumed capable of protecting every interest of all her citizens, while the promise and solvency of an individual, in equity, are so far questioned that he is required to perform all his equitable obligations before his opposing suitor will be decreed to perform his part of the agreement.

The remaining causes of demurrer go to the right of the State to sue without first paying the bonds, etc.  We have already expressed the opinion that the Act of 1861 is constitutional, and it authorizes the State to proceed in this matter.

Whether or not profert of instruments sued on shall be made, and what papers shall be filed at the commencement or during the pendency of a suit, are matters of practice and subject to legislative discretion; and whether or not the evidences of liability are filed and made of record, does not affect the rights of a litigant, so he is fully protected against further recovery upon the settlement of what he justly owes. And under the Act of 1861, the sovereignty of the State is pledged for his protection; by a solemn enactment of law she vouches, upon her faith and credit, that the lands redeemed, or by her sold and conveyed, shall be forever saved and protected from any further liability on account of these stock mortgages.  As a court, we cannot impute improper motives or charge bad faith upon the State; we must presume she will fulfill her obligations and make good all her pledges. Equity practice may require individuals, not primary in interest, who seek contribution or protection, to make sure their

offers by payment or other satisfaction, before appealing to a court to seize funds held by another as indemnity. But when the government assumes the liability, the presumption is that she will in good faith carry out her agreements, and therefore the reason ceases for enforcing such rule as applies to individual citizens.

In this case the appellant bound himself to pay and when such payment extinguishes his liability and protects him against all further suit or demand, and to this extent he is protected by the law and the absolute guarantee of his government, he cannot complain that injustice has been done him, and he ought not to complain at being required to fulfill his own contract. But he says the State ought not to sue. Who then, by the terms of his contract, was to be plaintiff, upon the ultimate failure to pay the amount of these stock bonds and mortgages? By the law, *Section 14, Act of October* 1836, which was a part of the contract, all the bonds and privileged mortgages, executed for stock, were transferred to the State and the holders of the bonds to be insured by the State as a guarantee of the State's bonds, and these mortgages were all so executed and transferred before the State executed her bonds. Now, why were these bonds and mortgages, by a provision of law before that time enacted and agreed to, thus transferred to the State, if she was not to sue in case the obligors did not fulfill their agreement? It was the State and not the bondholders that took these steps, and for her own protection incorporated these provisions in her contract. Yet it is urged that these mortgages were to the bank and not to the State, notwithstanding this solemn provision of law that upon their execution they were to be transferred to the State, and it is altogether clear that the parties contracting never contemplated a foreclosure of these mortgages by the bank, because the bank was to go out of existence the very day the stock-bonds and mortgages fell due; hence, it seems clear that they intended some other, and not the bank, should enforce these claims.

But it is urged that the receiver, appointed by the chancellor, to take charge of the assets of the bank, should have brought this suit. If we grant that he could have done so; if he, an individual, could thus act for the State and the bond-holder, under the law, could she not likewise act for herself and the bond-holders when expressly empowered by an Act of the Legislature? Is not the wealth and honor of the sovereign State security to the claimants, and the bond-holders, of as high a grade as the bond of a trustee with such surety as he could command? And the will of the people, when properly expressed by the Legislature, if not in conflict with the Constitution, is the rule of action for both State and citizen. We see no sufficient reason in law to estop the State from maintaining such suit. If she cannot sue, no suit can be maintained, and this would present a legal anamoly of most deliberate contracts, involving millions of dollars gain to one party and a corresponding loss to the other, and no right of recovery.

The Solicitor of the State is certainly in error in attempting to proceed in this form of action to recover the amounts received upon the five hundred bonds, hypothecated for funds to establish the western branch bank. At and before this time, the Legislature had assumed that these bonds were illegally disposed of, and that the State was not liable for their payment, and they and the mortgages to secure the State therefor, were not embraced within the provisions of the Act of 1861, and a suit under that Act, so far as they are concerned, cannot be maintained. But as she had the right to proceed for the amount of the 1530 bonds, her claim for an additional sum, not collectable by such proceeding, should have been otherwise met and was not the subject of demurrer.

Upon the whole case, taking the bill as confessed, it appears to us that the appellant has only been decreed to pay what in duty and law he ought to have paid. And the mortgagor's inquiries as to whether the State stands in the attitude of surety, acts as trustee, or as principal, need be of but little

concern so he pays no more than he obligated himself to pay, and no more than a just recompense for what he received, and thereupon is exonerated from all further liability.

The decree of the Chancery Court is in all things affirmed and the cause remanded.